Filed 4/23/26  In re A.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re A.A., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E087156 |
| Plaintiff and Respondent, | (Super.Ct.No. J292615) |
| v. | OPINION |
| C.R. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant, C.R.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant, R.A.

1

Laura Feingold, County Counsel, David R. Guardado, Deputy County Counsel, for Plaintiff and Respondent.

Appellants C.R. (mother) and R.A. (father) appeal the juvenile court's order terminating parental rights and freeing their child A.A. (born in 2017) for adoption. (Welf. & Inst. Code,[1] § 366.26.) They fault the court for failing to apply the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) We affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. Detention

In early 2022, mother was living with A.A. and four of her other children.[2] On March 16, 2022, law enforcement executed a search warrant at her residence and discovered over four pounds of methamphetamine (meth), along with residue, acetone, lighter fluid, glass dishes, and a scale in her bedroom; these items suggest the operation of a meth lab. Mother was arrested, and an immediate response referral was made to San Bernardino County Children and Family Services (CFS). Mother was interviewed and indicated she last used meth on March 16, 2022, prior to being arrested. A.A. stated that mother and her significant other "fight with each other." One of A.A.'s half siblings claimed she was sexually abused by the maternal great-grandfather. Although mother

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Mother's children include A.A., T.A. (born 2014), A.R. (born 2010), R.F. (born 2008), S.R. (born 2005), I.B. (adult), A.S. (adult), and F.S. (adult). Father is the biological father of T.A. and the presumed father of A.A.
  This appeal involves A.A. only.

2

was aware of the child's claim, she did not report the abuse out of concern for his age and how it would affect him.

On March 24, 2022, CFS initiated dependency proceedings, alleging mother has a history of substance abuse and engaging in domestic violence (§ 300, subd. (b)), both parents are incarcerated (§ 300, subd. (g)), and mother failed to protect A.A.'s half sibling from sexual abuse (§ 300, subds. (b), (j)). A.A. was detained, and the juvenile court ordered supervised visitation.

### B. *Jurisdiction/Disposition*

In its jurisdiction/disposition report filed April 12, and addendum filed May 10, 2022, CPS recommended detention and reunification services. Mother admitted engaging in domestic violence with father (with both being physically harmed) and being aware that the children witnessed the domestic violence. She was previously incarcerated for smuggling drugs into the United States from Mexico; she acknowledged a substance abuse issue, but denied manufacturing meth or keeping drugs in her home. She began using meth at age 13, experienced periods of sobriety, and relapsed in 2020. A.A.'s older siblings reported mother hid drugs throughout the home and used them "almost every day." Mother had an extensive child welfare history involving physical abuse, neglect, and domestic violence in the home. Father was incarcerated for murder and attempted murder with an unknown release date. According to the social worker, the "most significant problems in this case are the exposure of domestic violence . . . the sexual abuse of [A.A.'s half sibling], the mother's substance abuse problem, the family's

3

criminal history and the parent's failure to protect, all which place[] the children at risk of abuse."

At the jurisdiction/disposition hearing, the juvenile court found the allegations true, declared A.A. a dependent, removed her from parents' custody, and ordered reunification services and supervised visitation.

### C. *Six-month review report and hearing*

By the time of the six-month review report, mother was on probation (compliant with her terms), living in an apartment, and employed with Cal Trans, working three days a week. She started domestic violence classes, completed a parenting program, was attending a child abuse treatment program, and participated in outpatient substance abuse treatment services but had missed 12-step meetings. Her random drug tests were negative; however, she failed to show for one test because she had been too busy and was overwhelmed. Mother consistently participated in visitation, bringing food and drinks. A.A. appeared to enjoy the visits, but told her foster parent that mother said she (A.A.) only needs to listen to mother. The social worker had to remind mother not to speak to the child about the dependency and told her to stop taking father's calls during her visitation. Father remained incarcerated, was working on obtaining his high school diploma, and had not yet participated in services because there were "limited services offered" at his detention center. A.A. was placed in the same home as A.R.

On November 14, 2022, the juvenile court ordered continued reunification services for both parents and authorized unsupervised visitation for mother.

## D. Twelve-month review report and hearing

In its 12-month/permanency review report filed April 21, 2023, CPS recommended termination of reunification services for both parents and placement of A.A. in foster care with a goal of placement with a willing relative. CPS expressed concerns with mother's inconsistent drug and alcohol testing, lack of progress on her reunification plan, and poor decision making regarding her relationships with abusive men. She completed individual therapy, a domestic violence program, and substance abuse treatment classes. Initially, she tested negative on a regular basis; however, she missed a number of tests including all tests in March and April 2023. She was working, but lacked stable transportation. She ended the relationship with her boyfriend because both were violating their probation by affiliating with each other; on January 31, 2023, he was arrested due to domestic violence against her. Mother stated that she planned to marry father upon his release from custody. Father failed to maintain contact with the social worker or make efforts on his plan; however, he called mother during her visits with the children and sent letters. A.A. had been moved from her foster care placement along with A.R., then moved again following an incident of self-harm by A.R. resulting in a psychiatric hold.

At the May 1, 2023, hearing, both parents objected to termination of parental rights. Mother testified. Regarding her missed drug tests, she blamed it on her limited transportation means and decision to visit her daughter at the hospital instead of drug test; however, she later admitted that she only visited her daughter two times while she was hospitalized. Mother stated she lives in a three-bedroom house and has bunk beds for her

5

children.  Regarding her prior statement about marrying father upon his release from custody, she clarified that he also needed to take "every step that [she had] done . . . for . . . [the] children's safety."  Following argument, the juvenile court found that mother had not benefitted from services given her domestic violence relationships (father and her recent boyfriend) and her multiple failures to drug test prior to the hospitalization of her daughter.  The court agreed that CPS's recommendations were appropriate, terminated reunification services for both parents, ordered a permanent plan for A.A., and continued supervised visitation.

*E.  Postpermanent plan review*

For the postpermanent plan review hearing on November 1, 2023, CPS recommended placement in foster care with a permanent plan of adoption or legal guardianship.  Neither parent had maintained communication with the social worker.  Mother stopped attempting to complete any services due to "doing 'too much at once and falling back into depression.'"  She was working but still had not obtained stable transportation.  Father remained incarcerated.  The juvenile court adopted the recommendation and continued the child in foster care.  Parents' visits were ordered supervised, once monthly for two hours, and the matter was continued.

In its postpermanent plan review reports filed April 22, and October 23, 2024, CPS recommended the permanent plan and visitation schedule remain the same.  A.A. had been placed with A.R.; however, she was returned to the home of Ms. B. where she was doing good, but expressed a desire to be placed back with mother.  Mother's monthly visits were going well, and father maintained telephonic visitation.  CPS did not

6

recommend weekly visits for mother because of her history of failing to confirm her visit or showing up late. The children were visiting each other and expressed a desire for more sibling visits without mother being present. The juvenile court adopted CPS's recommendations and continued the hearing.

By April 2025, CPS recommended a section 366.26 hearing to establish a permanent plan of adoption for A.A. The child reported that she loves being in Ms. B.'s home, loves Ms. B., refers to Ms. B.'s daughter as her sister, and "would be okay staying with Ms. B. permanently so long as she gets all of her stuffed animals from her mother's home and is able to talk to her mother sometimes." Mother's visitation was inconsistent. The juvenile court set the matter for a section 366.26 hearing.

*F. Section 366.26 hearing*

In its section 366.26 selection and implementation report filed August 19, 2025, CPS recommended termination of parental rights and adoption as A.A.'s permanent plan. Despite mother's inconsistent visitation, the child was excited to see her and would ask the social worker about her during their monthly contacts. A.A. was having trouble accepting the fact that she could not reunify with mother because mother continued to give her "false hope of returning" home; however, A.A. was "closely bonded" to Ms. B. who provides emotional consistency and stability, stating, "'I do not want to go anywhere else. I love being here.'" The social worker opined that A.A. is "appropriate for adoption," and Ms. B. is "dedicated to [the child] and committed to raising her to adulthood." On August 28, 2025, the juvenile court set the matter for a contested hearing.

At the contested hearing, mother testified that she visits A.A. regularly and the child is "super happy" when they visit. She described their visitation activities and stated A.A. "keeps asking when is she going to come home." Mother opined the two share a bond as evidenced by the child talking about what happens at school and calling her for help with homework, to say prayers, or to hear a song before bedtime. Following argument, the juvenile court found A.A. to be both generally and specifically adoptable by clear and convincing evidence. Regarding the parental bond exception, the court found that father failed to meet the first prong, but mother met both the first and second prongs (regular, consistent visitation and a bond). However, turning to the third prong, the court observed that A.A. had been removed from parental control more than three years ago, she has been in a stable, loving placement for the last year, and she is bonded to her caregiver and the caregiver's family. The court added, "[G]iven the stability that this child desperately needs, stability outweighs any potential detriment from the termination of parental rights." Having concluded that mother failed to establish the parental bond relationship exception, the court terminated parental rights and ordered adoption as the permanent plan.

## II. DISCUSSION

Mother contends the juvenile court erred in finding that the beneficial parent-child relationship exception to termination of parental rights did not apply. Father joins with mother's argument and contends reversal of the order terminating her parental rights mandates reversal of the order terminating his.

8

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption" unless it "finds a compelling reason for determining that termination would be detrimental to the child due to one or more" enumerated exceptions.  (§ 366.26, subd. (c)(1) & (c)(1)(B); see *In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).)  "The statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  One exception is the beneficial parent-child relationship exception.  (§ 366.26, subd. (c)(1)(B)(i).)  In *Caden C.*, our Supreme Court examined this exception and held that a drug-addicted parent's failure to succeed in drug rehabilitation programs and continuing struggles with addiction did not, on its own, disqualify the parent from being accorded the beneficial parent-child relationship exception.  (*Caden C.*, at pp. 637-641.)  In other words, unless the factors that led to the dependency in the first place also bear on the question of whether a child would benefit from continuing the relationship and be harmed, on balance, by losing it, they are irrelevant.  (*Id*. at p. 638.)

Under the parental relationship exception, the parent must show, by a preponderance of the evidence, each of the following three elements.  First, he or she had "regular visitation and contact with the child, taking into account the extent of visitation permitted."  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  Second, "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship."  (*Ibid*.)  This element is affected by

"'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id*. at p. 632.) In conducting this assessment, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.) Third party witnesses, including psychologists, can provide relevant evidence about the parent/child bond. (*Id*. at pp. 632-633.) Third, "terminating that [parental] attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id*. at p. 636.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved on another ground in *Caden C.*, at p. 636, fn. 5.)

We employ a "hybrid standard" of review to the juvenile court's findings on the application of the beneficial parent-child relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) The first two elements are primarily factual and reviewed for substantial evidence. (*Id*. at pp. 639-640.) On the third element, the "court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Id*. at p. 640.) Thus, any factual determinations underlying the court's evaluation would also be reviewed for substantial evidence, but the court's ultimate balancing of the detriment of severing the parent-child relationship against the benefits of adoption is reviewed for abuse of discretion. (*Id*. at pp. 640-641.)

10

In the present case, the juvenile court agreed that mother regularly visited the child and the two shared a bond. Concerning the third prong, mother asserts (1) A.A. spent the first four years of her life with mother, (2) the conditions that caused the child's removal were resolved, (3) mother completed all of the services required of her, (4) Ms. B. was the child's fifth placement whereas mother remained a stable influence in the child's life, and (5) mother represented a "fundamental primary bonded relationship" to the child who "loved being in Ms. B.'s home, [but] wished to continue to see her mother." Thus, mother argues "the record show[s that she] and A.A. had 'the kind of attachment implying that the child would benefit from continuing the relationship.'"

In deciding whether to sever the parents' relationship with A.A., the juvenile court was tasked with weighing "the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Here, the court had been involved in the dependency case for more than three and one-half years. It was aware of the standard set forth in *Caden C.* and found that mother had established the first two prongs. Regarding the third prong, the court observed that A.A. has "been in a stable, loving placement for a year. She is bonded to the caregiver and the caregiver's family. And I believe that, given the stability that this child desperately needs, stability outweighs any potential detriment from the termination of parental rights." The bond between A.A. and Ms. B. and Ms. B.'s family was well documented by CPS. Regarding Ms. B.'s home, A.A. stated, "'I do not want to go anywhere else. I love being here.'" The feeling was mutual as Ms. B. stated, "'I would not want her to go to another home, I can provide stability for her.'"

Considering the evidence, there is no indication that the detriment (if any) A.A. would suffer from terminating parental rights "'outweigh[s] the sense of security and belonging an adoptive home would provide.'" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.) Thus, the juvenile court did not abuse its discretion in finding that mother failed to carry her burden of establishing the parental benefit exception to adoption.

## III.  DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                    J.

We concur:

RAMIREZ
                P. J.

FIELDS
            J.